**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:19-cv-22435-UU

VERITAS PERSONNEL SERVICES, INC.,

     Plaintiff,

v.

ADP TOTALSOURCE, INC.,

     Defendant.

_____/

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

THIS CAUSE is before the Court upon Defendant ADP's Motion for Summary Judgment (D.E. 85) ("ADP's Motion") and Plaintiff Veritas's Motion for Partial Summary Judgment (D.E. 88) ("Veritas's Motion").

The Court has considered the Motions, the pertinent portions of the record and is otherwise fully advised in the premises. For the reasons explained herein, ADP's Motion is GRANTED IN PART and Veritas's Motion is DENIED.

**I.**    **Background**

Unless otherwise indicated, the following facts are undisputed.

    A.  The Parties

Plaintiff Veritas ("Veritas") is a staffing agency. D.E. 86 ¶ 1; D.E. 95 ¶ 1. Defendant ADP TotalSource ("ADP" or "TotalSource") is a Professional Employer Organization ("PEO") that provides human resource services, such as processing wages and remitting payroll taxes; providing guidance on employment practices, the National Labor Relations Act, and worksite safety; providing workers' compensation and employment practices liability insurance; and providing

1

employee benefits and 401(K) plans to its clients. D.E. 86 ¶ 2; D.E. 95 ¶ 2. Veritas was ADP's client. In turn, Veritas provided human resource support to its clients in various states across various industries. D.E. 89 ¶ 2; D.E. 94 ¶ 2. Veritas acted as a co-employer of its clients' employees, assuming responsibility for, among other things, correctly compensating employees under the FLSA. *Id.*

B.   The Client Services Agreement

On February 28, 2008, Veritas and ADP executed a Client Services Agreement (the "Agreement") under which ADP was to provide Veritas with services including, among other things, for ADP to process and remit the appropriate payroll taxes and for ADP to provide guidance on commercially accepted human resource practices and compliance with various federal, state, or local employment laws such as the Fair Labor Standards Act (the FLSA). D.E. 86 ¶¶ 3–4; D.E. 95 ¶¶ 3–4. The Agreement contains the following relevant provisions:

- Section (3) Responsibilities of the Parties; Mutual Duty to Cooperate. "TotalSource agrees to inform . . . [Veritas] about **potential and actual employee issues** as they arise to the extent TotalSource knows about the issues." D.E. 39 Ex. A § 3 (emphasis added).

- Section (5) TotalSource's Services and Responsibilities. "To provide the Services and fulfill the responsibilities described in this Section, Client agrees that it must provide TotalSource with the necessary information and ability to furnish such Services or fulfill such responsibilities as required in [the Agreement]. **Client acknowledges that TotalSource's provision of its Services is dependent upon the completeness, accuracy, and timeliness of the information that Client provides to TotalSource**." *Id.* § 5 (emphasis added).

- Section (5)(B) TotalSource's Guidance Regarding Employment Practices. "TotalSource will provide Client **guidance** regarding commercially accepted human resource practice and **compliance with the various federal, state, or local employment laws**, such as anti-discrimination laws . . . [and] the Fair Labor Standards Act (FLSA) . . . . Client understands and acknowledges that any guidance is not intended to be and does not constitute legal advice." *Id.* § (5)(B) (emphasis added).

- Section (6) Client's Responsibilities. Client agrees that it is responsible for complying with the laws affecting or regulating its business, Worksite Employees, independent contractors, etc. Client recognizes that TotalSource's provision of Services does not relieve Client of

2

responsibility and liability for those matters over which it has control. Client also understands that there may be laws that apply because of the PEO arrangement with which Client must now comply (e.g., FMLA). Given that possibility, Client Agrees to comply with those laws." *Id.* § 6.

- Section (6)(B) Wage and Hour Laws. "Client is responsible for setting the level of wages to be paid at or above the applicable minimum wages and/or salary requirements. Client agrees to (i) provide TotalSource with complete and correct information regarding hours worked, job classification, exempt and non-exempt status, and other data needed to compute accurately wages, taxes, etc.; (ii) collect, verify, and transmit to TotalSource's administrative office not less than three (3) business days before each payroll date any information required to determine accurately the amount due to the Worksite Employees and TotalSource; and (iii) promptly make any necessary corrections to correct a violation of the FLSA or comparable state laws. **Client acknowledges that it remains responsible for compliance with the FLSA.**" *Id.* § (6)(B) (emphasis added).

- Section (7)(A) Payment Amount. "Client agrees to pay TotalSource the amount(s) specified in the Pricing Addendum." *Id.* § (7)(A).

- Section (7)(B) Payment Terms. "Client acknowledges that it is responsible for all taxes, if any, arising out of the execution and performance of this Agreement." *Id.* § (7)(B).

- Section (8)(E) Remedies not Exclusive; Severability: "The rights and remedies provided by this Agreement are not exclusive. Either party is entitled to any rights or remedies created by law (whether currently existing or created in the future) as well as those contained in this Agreement." *Id.* § (8)(E).

The Agreement also contains the following provisions with respect to indemnification:

- Section (9)(A) Indemnification – General Provisions. "The parties agree that the indemnification provisions contained in this Section apply to claims, expenses, or liabilities for which one of the parties is solely liable and/or for which the parties are jointly liable. In the event of joint liability, if either party pays funds in connection with a claim, expense, or liability which is subject to the indemnification provision in excess of the pro-rata share, the other party will indemnify and promptly pay the other party for the excess amount. Each party agrees to notify promptly the other of any claim or judgment to which this indemnification provision may apply. Further, **the parties agree not to settle any claim to which the indemnity provision may apply or in which the parties are both named without the prior written consent of the other party, which consent will not be unreasonably withheld.** Neither party will be liable to the other party for special, incidental, consequential, or punitive damages. Each party's indemnification provision survives the termination or expiration of this Agreement." *Id.* § (9)(A) (emphasis added).

- Section (9)(B) TotalSource's Indemnification. **"TotalSource agrees to indemnify, protect, defend, release, and hold harmless Client** . . . from and against any and all liability, expenses, losses, and claims for damages arising from or in connection with (i)

any actions or inactions of the Worksite Employees, TotalSource's Corporate Employees, officers, directors, agents or independent contractors while under TotalSource's direction, supervision, or control; **(ii) TotalSource's breach of this Agreement;** or (iii) TotalSource's negligent, fraudulent, willful, or reckless performance or non-performance of any of its responsibilities described in this Agreement." *Id.* § (9)(B) (emphasis added).

### C.  Veritas Contracted with E&L to Staff E&L with Delivery Truck Drivers

On May 5, 2008, Veritas contracted with E&L Transfer, LLC ("E&L") to recruit, screen, and hire employees to perform logistics and truck driving work for E&L. D.E. 86 ¶ 5; D.E. 95 ¶ 5; D.E. 87-1 at 110–14 (the Client Agreement between E&L and Veritas). Relevant to this action, Veritas and E&L were co-employers of delivery truck drivers in Texas and paid some of the Texas drivers at a daily rate (the "Texas Day-Rate Drivers"). D.E. 89 ¶ 2; D.E. 94 ¶ 2.

The Texas Day-Rate Drivers reported to E&L's worksite. D.E. 86 ¶ 6; D.E. 95 ¶ 6. ADP did not direct, control, or modify the working conditions of the worksite employees or set their schedules, nor did ADP determine the Texas Day-Rate Drivers pay rates. D.E. 86 ¶ 8; D.E. 95 ¶ 8.

Veritas was contractually obligated to E&L to perform human resource-related work, which, in turn, Veritas obtained through ADP.[1] D.E. 87-1 at 111–12; D.E. 86 ¶ 5; D.E. 95 ¶ 5. Veritas was responsible for ensuring that the employees were "properly paid" and "withhold[ing], pay[ing], and report[ing] all taxes" with respect to the employees, and Veritas maintained "all personnel files and payroll records for [the] employees." D.E. 87-1 at 112.

E&L was contractually obligated to track and accurately report employee hours. D.E. 86 ¶ 17; D.E. 95 ¶ 17; D.E. 87-1 at 112 ("[E&L] agrees to promptly track all hours worked by Employee and truthfully report all such hours to Veritas"). During the relevant timeframe, E&L did not

---

[1] Veritas did not disclose ADP's involvement to E&L until 2014. D.E. 86 ¶ 5; D.E. 95 ¶ 5.

provide Veritas with hours logs as to the Texas Day-Rate Drivers. D.E. 87-1 at 15. E&L however, did provide Veritas with spreadsheets containing the number of days the Texas Day-Rate Drivers worked. *Id.* at 23. Veritas did not audit the information it received from E&L, nor did Veritas independently verify employee time and pay information submitted by E&L for the Texas Day-Rate Drivers; rather, Veritas simply transferred the information from E&L to ADP for processing. D.E. 86 ¶¶ 17, 18; D.E. 95 ¶¶ 17, 18.

Veritas, using ADP, paid the Texas Day-Rate Drivers. *See* D.E. 89-12 (composite exhibit containing numerous paychecks); 87-5 at 2. According to the deposition of Veritas's President and corporate representative, Marcia Radel, Veritas would bill E&L for employees' paychecks and get "reimbursed," with a 32% markup.[2] D.E. 87-1 at 90, 107.

### D. Veritas Hired Delivery Truck Drivers in Texas and, After Consulting with ADP, Paid Some of the Texas Drivers at a Daily Rate

On April 21, 2009, Ms. Radel emailed Veritas's designated ADP Human Resource Business Partner, Michelle (Matthews) Berman: "We have about six drivers that are classified as a lead. They are responsible for the training of new drivers and assisting the managers with other duties. Should those people be hourly or salary?" D.E. 86 ¶ 11; D.E. 95 ¶ 11. On April 22, 2009, Ms. Berman responded by email that the lead drivers could be paid hourly or salary, but were not exempt under the FLSA and **were entitled to overtime** compensation. *Id.*; D.E. 87-1 at 44.

On April 30, 2009, Veritas emailed Ms. Berman to advise her that Veritas was hiring 78 new drivers in Texas and asked her about the overtime rules in Texas. D.E. 86 ¶ 12; D.E. 95 ¶ 12.

---

[2] For its services, ADP charged Veritas a fee that was equal to a percentage of the total payroll, along with other fees. D.E. 87-1 at 40–41. In that arrangement, ADP would prepare the payroll, which included preparing the paychecks (with Veritas's ADP account listed as the payor) for the employees and remitting the employment taxes to the IRS. *Id.*; D.E. 39 Ex. A.

Ms. Berman responded: "It is my understanding your drivers will be paid regular pay, not bonuses, so OT [overtime] is calculated at one-and-one-half times the hourly rate for any time worked over 40 hours in a workweek," and further stated that, "Overtime pay for a non-exempt employee depends on the employee's 'regular rate' of pay . . . . Regardless of whether a non-exempt employee is paid by an hourly rate, salary, piece rate, **day rate**, . . . or by some other method or combination of methods, the pay must be converted into an hourly equivalent to arrive at the 'regular rate' for **overtime** computation purposes." *Id.* (emphasis added); D.E. 87-1 at 48; D.E. 87-2 at 9–10.

Veritas claims that despite this advice, sometime between April 30 and May 5, 2009, Ms. Radel orally requested guidance from Ms. Berman on the method of payment for drivers it was hiring for E&L in Texas and whether Veritas could pay its Texas drivers using a **daily rate of pay**. D.E. 86 ¶ 13; D.E. 95 ¶ 13. According to Ms. Radel, Ms. Berman responded that Veritas could use a daily rate for its Texas drivers, so long as the rate of pay did not drop below minimum wage. D.E. 86 ¶ 14; D.E. 95 ¶ 14; D.E. 89-4 at 27–29 (Ms. Radel's deposition as to the phone call). Ms. Berman testified at her June 18, 2020 deposition that she did not remember such a phone call "and if there was a phone call . . . [she] would have provided something back to [the inquirer] in writing as a typical response to all clients." D.E. 99-7 at 8–11. On May 6, 2009, Ms. Radel emailed Ms. Berman the following: "The employees for the most part, are paid daily rates. Is there an OT [overtime] concern if their calculated rate of pay for the day is above minimum wage?" D.E. 89 ¶ 18; D.E. 94 ¶ 18; D.E. 89-9. From the record, it appears that Ms. Berman did not respond to the May 6th email. *See id.*

Veritas alleges that in reliance on ADP's guidance, Veritas paid some of its Texas drivers a daily rate and was later exposed to liability when some of the drivers filed lawsuits alleging a

failure to pay statutory overtime. D.E. 86 ¶ 15; D.E. 95 ¶ 15. However, Ms. Radel, who testified

as Veritas's corporate representative, conceded that no one from ADP ever explicitly advised

anyone at Veritas that despite paying a day rate to the drivers, it did not need to track their hours

or pay them overtime compensation for hours worked over 40 in any week. D.E. 96-1 at 19–20. In

her June 17, 2020 deposition, Ms. Radel stated:

> Q: And nobody from TotalSource told anyone at Veritas, including yourself, that it
> did not have to track employee hours. Isn't that right?
> A [Ms. Radel]: That's correct.
> A: . . . [W]ould you agree that nobody at TotalSource ever told anybody at Veritas
> that it did not have to pay overtime compensation?
>  A: I would agree to that.
> MR. STAGE: I'm sorry. What was the answer?
> A: I agree that we were not told by ADP TotalSource that we had to pay overtime.
> That was what you asked.
> Q: No. I said nobody at TotalSource ever told anyone at Veritas that you did not
> have to pay overtime.
> A: **No, no one told me I did not have to pay overtime**. **They didn't tell me I had
> to. They didn't tell me I didn't have to.**

*Id.* (emphasis added). The parties agree that failure to pay the drivers statutory overtime while

using a daily rate of pay violated the FLSA. D.E. 89 ¶ 47; D.E. 94 ¶ 47; D.E. 89-18; D.E. 89-4 at

19.

     E.   <u>ADP's Payroll System</u>

Electing a daily rate method of compensation did not exist as a drop-down option in ADP's

payroll system template. D.E. 89 ¶ 24; D.E. 99 ¶ 24. The only drop-down options available to

reflect an employee's method of compensation were "hourly" or "salary," and these templates

could not be overridden. *Id.* To accommodate its method of compensating the Texas Day-Rate

Drivers, Veritas entered the daily rate as the "hourly rate" in ADP's payroll system, so that one

hour was the equivalent to one day, two hours was the equivalent of two days, etc.[3] D.E. 89 ¶ 26; D.E. 99 ¶ 26. This was accomplished before the first pay date in May 2009. D.E. 89 ¶ 25; D.E. 99 ¶ 25. According to internal ADP business records, Veritas's Texas Day-Rate Drivers rarely, if ever, worked more than five or six "hours"—meaning days—in any given week. D.E. 89 ¶ 26; D.E. 99 ¶ 26; D.E. 89-11 at 9.  In contrast, Veritas employed delivery truck drivers in a number of other states that were paid using hourly rates (including overtime), not a daily rate method. D.E. 89 ¶ 28; D.E. 99 ¶ 28. ADP never questioned Veritas as to why it used different methods to pay delivery truck drivers in different states. D.E. 89 ¶ 29; D.E. 99 ¶ 29.

On a weekly basis, Veritas uploaded the daily rates used to compensate the Texas Day-Rate Drivers and the numbers of days worked. D.E. 89 ¶ 31; D.E. 99 ¶ 31. This information was reflected in ADP business records generated for every Texas Day-Rate Driver for every pay period, called an "Earnings Statement." *Id.* There were never any overtime hours reflected in ADP's payroll system for the Texas Day-Rate Drivers for the period May 2009 through December 2014. D.E. 89 ¶ 33; D.E. 99 ¶ 33. ADP's payroll system did not generate warnings if an employer failed to pay overtime to nonexempt employees, except that an error message to the client would appear if hours above 40 hours per week were entered as regular hours instead of overtime hours. D.E. 89 ¶ 34; D.E. 99 ¶ 34. Nonetheless, ADP never raised any concerns with Veritas regarding how it was compensating the Texas Day-Rate Drivers. D.E. 89 ¶ 37; D.E. 99 ¶ 37.

ADP maintains electronic records that can generate internal reports called "Employee Snapshots," which are internal ADP business records that reflect (among other things) the employees' anticipated annual compensation (assuming 40 hours worked for each employee per

---

[3] It is unclear whether Veritas did this upon ADP's advice or on its own. According to the deposition of ADP's corporate representative, Dawn Pilley, "there w[asn't] anybody who would help [Veritas] find the appropriate rate." D.E. 89-10 at 7.

week times 52 weeks). D.E. 89 ¶¶ 39–40; D.E. 99 ¶¶ 39–40. According to the Employee Snapshots for the Veritas Texas Day-Rate Drivers, some Texas Day-Rate Drivers "earned" over $200,000 annually and at least one earned over $1 million. D.E. 89-11 at 22–26; D.E. 89-10 at 16–17.

ADP also maintains an electronic record for each client called a "Client Bio." D.E. 89 ¶ 42; D.E. 99 ¶ 42. "Special Processing Notes" in the Client Bio state, in at least four different places, that Veritas does "not allow OT [overtime] so no FLSA OT and they have some EE's that are on a daily rate." D.E. 89 ¶ 43; D.E. 99 ¶ 43; D.E. 89-15 at 4–6.

F.   Texas Day-Rate Drivers Sued Veritas Under the FLSA

Starting in October 2013, several of Veritas's current/former Texas Day-Rate Drivers sued Veritas and/or E&L for unpaid compensation under the FLSA. D.E. 86 ¶ 19; D.E. 95 ¶ 19. Each case settled and involved the payment of back pay compensation, liquidated damages, and attorneys' fees and costs. D.E. 86 ¶ 29; D.E. 95 ¶ 29. *See id.* ¶¶ 20–32. The cases, collectively referred to as the "Texas Day-Rate Driver Actions," include:

1.   *Natassia Mason, et al. v. Veritas Personnel Services, Inc., E&L Transfer, Inc., and Edward J. Tweed*, No. 4:13-cv-03498 (S.D. Tx. 2013) (the "*Mason* Action") and *Crystal Ozen, et al. v. Veritas Personnel Services, Inc., E&L Transfer, Inc., and Edward J. Tweed*, No. 4:13-cv-03498 (S.D. Tx. 2013) (the "*Ozen* Action") filed in October 2013 and November 2013, respectively. D.E. 39 ¶ 11; 86 ¶¶ 19–22; D.E. 95 ¶¶ 19–22. The *Mason* and *Ozen* Actions were consolidated as to both Veritas and E&L and settled in July and August 2014 for a total of $7,219. *Id.* Veritas received a formal legal analysis from its attorneys defending the *Mason*/*Ozen* Actions, detailing why its failure to pay statutory overtime while using the daily rate was legally improper. D.E. 86 ¶ 20; D.E. 95 ¶ 20. However, Ms. Radel testified that upon advice of counsel, no

changes to the drivers' pay was to be made until after the lawsuits were settled. *Id.* No one from ADP told anyone at Veritas not to pay the drivers the appropriate overtime once the lawsuits were filed. *Id.* As of the resolution of the *Mason* and *Ozen* Actions, changes to the Texas Day-Rate Drivers' payment method still had not been made. D.E. 86 ¶ 22; D.E. 95 ¶ 22.

2. *Lynde Emerson v. Veritas Personnel Services, Inc.*, No. 4:14-cv-01071 (S.D. Tx. 2014) (the "*Emerson* Action") filed in April 2014 and settled in January 2015 for $6,000. D.E. 86 ¶¶ 21, 23; D.E. 95 ¶¶ 21, 23.

3. *Dwight Bellard, et al. v. Veritas Personnel Services, Inc.*, No. 4:15-cv-01004 (S.D. Tx. 2015), Edrin Bell, Davy Cruz, and Andre Tennard (collectively, the "*Bellard* Action") filed in April 2015 and settled in April 2016 for a total of $47,000. D.E. 86 ¶¶ 25, 27; D.E. 95 ¶¶ 25, 27. Bellard settled for $12,313.42; Bell settled for $13,826.25; Cruz settled for $13,788.25; Tennard settled for $7,072.08. *Id.*

4. *Matthew Walker, et al. v. E&L Transfer, Inc., Edward J. Tweed, Veritas Personnel Services, Inc., and Marcia J. Radel*, No. 4:15-cv-2428 (S.D. Tx. 2015) (the *Walker* Action"), a collective action, filed in August 2015 and settled in December 2017 for $500,000. D.E. 86 ¶¶ 26, 28; D.E. 95 ¶¶ 26, 28. Walker alleged that Veritas and/or E&L "shaved time off" the drivers' hours, did not pay them for waiting or "down time," and did not pay some drivers properly after they had been converted to hourly rates of pay. *Id.* The *Walker* class was made up of approximately 88 drivers. *Id.*

E&L "pushed back" in its discussions with Veritas regarding converting the Texas Day-Rate Drivers' pay method and did not agree to make any changes until January 2015 and, even then, E&L delayed. D.E. 86 ¶ 24; D.E. 95 ¶ 24.  It took E&L until at least April 2015 to convert

the Texas Day-Rate Drivers to an hourly rate of pay with applicable overtime. *Id.*

ADP contributed approximately $170,000 to offset Veritas's costs and attorneys' fees incurred defending the Texas Day-Rate Driver Actions. D.E. 97-3 at 19–20; D.E. 92 at 2. Of that $170,000, $50,000 was paid by ADP to settle the *Walker* Action. *Id.*

The parties claim to dispute whether ADP consented in writing to the settlements. ADP contends that it did not consent in writing to the above settlements, as required for indemnification under the Agreement. D.E. 85 at 3. D.E. 86 ¶ 29. Veritas disputes that the Texas Day-Rate Driver Actions were settled without the written consent of ADP. D.E. 95 ¶ 29. However, the record establishes the absence of written consent; both parties cite to the June 17, 2020 deposition of Ms. Radel, in which she stated:

> Q: And nobody from ADP TotalSource participated in the settlement discussions that led to the settlement, correct?
> A [Ms. Radel]: Correct.
> Q: And Veritas did not have written consent from ADP TotalSource for any of these settlements, correct?
> A: Well, they didn't have -- **we didn't have written consent for the settlement**, but we requested assistance and notified them in writing for the class action, and they responded with there was no more assistance.
> Q: Okay. But you understand notice and written consent are different things, correct?
>  MR. STAGE: Object to the form. Go ahead, if you can answer.
> A: Yeah, I don't know. There were multiple conversations.

D.E. 87-1 at 79–80 (emphasis added); *see* also D.E. 97-3 at 11–12.

G. Veritas's Claimed Damages Against ADP

Veritas seeks a total of $1,503,332.61 in damages from ADP, consisting of (a) any back pay and liquidated damages Veritas paid the Texas Day-Rate Drivers in the Texas Day-Rate Driver Actions; (b) attorneys' fees and the class representative fee Veritas paid as part of the settlement of the Texas Day-Rate Driver Actions; (c) Veritas's attorneys' fees and costs incurred in defending the Texas Day-Rate Driver Actions; (d) payroll taxes and processing fees charged in processing

11

the back pay settlement checks through ADP;[4] (e) administrative service fees paid to ADP on the gross payroll for *all* Texas worksite employees paid between 2009 and 2015, whether or not they were part of any of the Texas Day-Rate Driver Actions, and irrespective of other services provided to Veritas for which the bundled service fee applied; and (f) lost profits or revenue based on what Veritas claims it would have invoiced E&L had the wages due to the Texas Day-Rate Drivers in the Texas Day-Rate Driver Actions been paid when the work was performed, which Veritas claims would have been subject to a 32% markup.[5] D.E. 86 ¶¶ 33–34; D.E. 95 ¶¶ 33–34; D.E. 87-1 at 177.

H.  The Motions

Veritas's remaining causes of action are for one count of breach of contract (Count 1) and one count of express contractual indemnity (Count 3). D.E. 39; D.E. 48. ADP moves for summary judgment seeking dismissal of both counts, arguing that Veritas "shirked its responsibilities under the [FLSA] . . . by delegating certain responsibilities to [E&L] . . . and now seeks to shift the fallout from its failure to comply with the FLSA on ADP, in contravention to the Agreement between the parties and applicable law." D.E. 85 at 1. In the alternative, ADP seeks to strike several components of the damages Veritas seeks. *Id.* Veritas opposes the Motion because ADP promised to be Veritas's human resource outsourcing partner, charged Veritas over $1.4 million for their services, and now is trying to use a "bait and switch strategy to sidestep its responsibilities to

---

[4] Payroll taxes were Veritas's obligation under the Agreement. D.E. 86 ¶ 33; D.E. 95 ¶ 33. ADP did not charge for any administrative processing fees in connection with the processing of the settlement checks in the *Walker* Action. *Id.*

[5] Veritas did not require E&L to reimburse it for the back pay damages paid out to the Texas Day-Rate Drivers. *Id.* Veritas's calculation of the lost profits/revenue includes recovery of the back pay compensation it had to pay out to the Texas Day-Rate Drivers, which it has sought as a separate component of damages. *Id.*  Veritas concedes it cannot recover these damages twice. *Id.*

indemnify Veritas." D.E. 92 at 2.

Veritas moves for partial summary judgment as to the breach of contract count because ADP allegedly knew about the FLSA violations and, under the Agreement, ADP was to advise Veritas of "potential and actual employee issues as they arise to the extent TotalSource knows about the issues." D.E. 88. ADP opposes the Motion, claiming that Veritas was ultimately responsible for complying with the FLSA; the breach of contract claim is time-barred under Florida law; Veritas cannot delegate its duty to comply with the FLSA; and ADP did not give Veritas improper FLSA guidance. D.E. 93. The Motions are ripe for disposition.

## II.   <u>Legal Standard</u>

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When determining whether the moving party has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002).

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of proving that no genuine issue of material fact exists, the non-moving party must make a showing sufficient to establish the existence of an essential element of that party's case and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrell*, 477 U.S. 317 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

If the record presents factual issues, the Court must not decide them; it must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment. *Impossible Elec. Techs., Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying the relevant legal questions raised by the pleadings are not otherwise in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## III.   <u>Analysis</u>

### A.  <u>Count 3: Express Contractual Indemnity</u>

ADP claims it is entitled to summary judgment on Count 3 because: (1) as a matter of law, Veritas cannot delegate its duty to comply with the FLSA to ADP; (2) Veritas failed to satisfy the contractual prerequisite of obtaining prior written consent from ADP to settle the Texas Day-Rate

14

Driver Actions; and (3) the Agreement does not permit indemnification based on the facts of this case. D.E. 85 at 4–11.

"A contract for indemnity is an agreement by which the promisor agrees to protect the promisee against loss or damages by reason of liability to a third party." *Dade Cnty. School Bd. v. Radio Station WQBA*, 731 So. 2d 638, 643 (Fla. 1999). Contractual indemnity concerns "the express terms of the agreement to indemnify." *Camp, Dresser & McKee, Inc. v. Paul N. Howard Co.*, 853 So. 2d 1072, 1077 (Fla. 5th DCA 2003). It is the terms of the indemnity agreement that "will determine whether the indemnitor is obligated to reimburse the indemnitee for a particular claim." *Id.*; *see also Mortg. Contr. Servs., LLC v. J & S Prop. Servs. LLC*, 2018 U.S. Dist. LEXIS 109967, at *13 (S.D. Fla. 2018).

In Section 9(B) of the Agreement, ADP agreed to "indemnify, protect, defend, release, and hold harmless" Veritas against "any and all liability, expenses, losses, and claims for damages arising from or in connection with . . . (ii) [ADP's] breach of th[e] Agreement; or (iii) [ADP's] negligent, fraudulent, willful, or reckless performance or non-performance of any of its responsibilities described in this Agreement." D.E. 39 Ex. A *Id.* § (9)(B). However, Section 9(B) is conditioned upon Section 9(A), which provides that, even where both parties are jointly liable, "the parties agree not to settle any claim to which the indemnity provision may apply or in which the parties are both named **without the prior written consent** of the other party, which consent will not be unreasonably withheld." *Id.* § (9)(A) (emphasis added).

### i. Whether ADP was a Joint Employer of the Texas Day-Rate Drivers is of No Moment

In support of its argument that it is entitled to summary judgment because Veritas cannot delegate its duty to comply with the FLSA to ADP, ADP argues that since it was not a joint employer of the Texas Day-Rate Drivers, Veritas cannot seek indemnification from ADP. D.E. 85

15

at 4–5. This argument is misleading because it does not accurately correspond to or address Vertitas's contractual indemnification claim.

The authorities ADP cites regarding whether it was a joint employer of Texas Day-Rate Drivers have no bearing on the contractual indemnification claim because in this case, there is no pending FLSA claim. This fact alone distinguishes this case from the cases ADP cites, which are all FLSA actions. *Scalia v. Emplr. Sols. Staffing Grp., LLC*, 951 F.3d 1097, 1100 (9th Cir. 2020); *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 138–39 (2d Cir. 1999); *Lyle v. Food Lion, Inc.*, 954 F.2d 984, 987 (4th Cir. 1992); *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1264 (5th Cir. 1986); *McDougal v. G & S Tobacco Dealers, LLC*, 712 F. Supp. 2d 488, 492 (N.D. W.Va. 2010); *Jeanneret v. Aron's E. Coast Towing, Inc.*, No. 01-8001-CIV-HURLEY, 2002 U.S. Dist. LEXIS 12200, at *5 (S.D. Fla. Jan. 29, 2002); *Beck v. Boce Group, L.C.*, 391 F. Supp. 2d 1183, 1191 (S.D. Fla. 2005); *Neto v. Car Salon, LLC*, No. 03-61751-CIV-HUCK/TURNOFF at pp. 8-10 (S.D. Fla. Apr. 22, 2004). In all of these cases, the courts precluded cross-claims or third party claims for common law indemnification or contribution in pending FLSA overtime lawsuits. *See id.* In this case, in contrast, no FLSA claim is pending and the source of the claim is the contract between the parties, which expressly allows for indemnification.

### ii.    Veritas Did Not Obtain ADP's "Prior Written Consent" to Settle the Texas Day-Rate Driver Actions

ADP argues that even if Veritas can seek indemnification from ADP, the unambiguous language of the Agreement requires dismissal of Count 3 because Veritas "admittedly did not satisfy the prerequisites to bringing this action by failing to obtain prior written consent from ADP[] before settling the underlying FLSA actions – an unambiguous prerequisite articulated in § (9)(A) of the [Agreement]." D.E. 85 at 7. Veritas responds that the term "prior written consent" is ambiguous and, as such, a jury should be permitted to assess ADP's conduct to decide whether

(1) ADP's crediting of monthly administrative fees it charged Veritas to offset Veritas's attorneys' fees incurred in the Texas Day-Rate Driver Actions constituted prior written consent, and (2) ADP's contribution of $50,000 in the *Walker* Action constituted prior written consent. D.E. 92 at 10–12.[6] Veritas argues that because ADP "was on notice," had "an opportunity to defend," and "elected to play a passive role in the resolution of the cases," ADP "cannot now challenge the reasonableness either of the decision to settle or the settlement amounts." *Id.* at 13, 14.

The question of whether a written contract is ambiguous is a question for the court, to be determined as a matter of law. *Lawyers Title Insur. Corp. v. JDC (America) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995); *Siedle v. Nat'l Assoc of Securities Dealers, Inc*., 248 F. Supp. 2d 1140, 1143–44 (M.D. Fla. 2002) (explaining that contract interpretation is a question of law and that if the contract is unambiguous, dismissal is permitted). "[U]nder Florida law[,] contractual language, when possible, is to be interpreted according to its plain meaning in line with generally accepted rules of construction to give effect to the intent of the contracting parties. Likewise well-established is the proposition that indemnification clauses are similarly subject to the general rules of contractual construction." *BVS Acquisition Co. v. Brown*, 649 F. App'x 651, 654 (11th Cir. 2016) (internal citations and quotations omitted). "Questions of fact arise only when an ambiguous contract term forces the court to turn to extrinsic evidence of the parties' intent . . . to interpret the disputed term." *Lawyers Title Insur. Corp.*, 52 F.3d at 1580 (citations omitted). "Such an ambiguity, however, 'does not exist merely because a contract can possibly be interpreted in more than one manner.'" *Id.* (citing *Shipner v. Eastern Air Lines, Inc*., 868 F.2d 401, 409 (11th Cir.

---

[6] Veritas also contends that the Agreement was not negotiated at arms-length and thus the term "prior written consent" should be construed against ADP. D.E. 92 at 9. This argument is at odds with Veritas's breach of contract and express contractual indemnity claims, which presume the existence of a valid contract. The Court will not permit Veritas to use the Agreement as both a sword and a shield.

1989) (applying Florida law); *Saha v. Aetna Casualty & Sur. Co*., 427 So. 2d 316, 317 (Fla. 5th DCA 1983) ("This principle applies only when there exists a genuine inconsistency, uncertainty or ambiguity in meaning after resort to the ordinary rules of construction.").

The Court will not look beyond the plain meaning of "prior written consent." Section (9)(A) of the Agreement provides, in pertinent part: "the parties **agree not to settle** any claim to which the indemnity provision may apply . . . without the **prior written consent** of the other party." D.E. 39 Ex. A § (9)(A) (emphasis added). At Ms. Radel's deposition as Veritas's President and corporate representative, she confirmed that Veritas failed to obtain the requisite written consent:

> Q: And Veritas did not have written consent from ADP TotalSource for any of these settlements, correct?
> A: Well, they didn't have -- **we didn't have written consent for the settlement**, but we requested assistance and notified them in writing for the class action, and they responded with there was no more assistance.
> Q: Okay. But you understand notice and written consent are different things, correct?
>  MR. STAGE: Object to the form. Go ahead, if you can answer.
> A: Yeah, I don't know. There were multiple conversations.

D.E. 87-1 at 79–80 (emphasis added); *see also* D.E. 97-3 at 11–12. Further, Ms. Radel stated that Veritas did not include anybody from ADP in the settlement discussions that led to the settlement of the underlying Texas Day-Rate Driver Actions. *Id.* ("Q: nobody from ADP TotalSource participated in the settlement discussions that led to the settlement, correct? A [Ms. Radel]: Correct."). Moreover, Veritas did not plead in its complaint, and indeed has never alleged, that ADP ever provided its express written consent to settle the Texas Day-Rate Driver Actions. *See id.*; D.E. 48 at 7.

Accordingly, Veritas's arguments fail. First, Veritas's claim that ADP credited Veritas for attorneys' fees Veritas incurred in defending the Texas Day-Rate Driver Actions somehow

constituted ADP's prior written consent to settle is meritless. ADP credited Veritas $50,000 towards fees incurred in the *Walker* Action and approximately $120,000 towards fees incurred in the other Texas Day-Rate Driver Actions.[7] D.E. 97-3 at 19–20; D.E. 92 at 2. However, the fact ADP gave Veritas credits does not constitute "written consent" to the resolution of the Texas Day-Rate Driver Actions. And, according to the deposition of ADP's corporate representative, Dawn Pilley, ADP provided Veritas with the credits because Veritas was "a really large client for [ADP], and [ADP] made the decision [as] a retention issue. . . . [ADP] did want to try to save the business and try to save the account, so [they] provided the credits in an attempt to retain the relationship." D.E. 100-3 at 22. Her testimony is unrefuted.

Second, the Court is unpersuaded that ADP's payment of $50,000 toward the *Walker* Action resolution constituted written consent to settle the *Walker* Action. On June 9, 2017, Ms. Pilley spoke with Ms. Radel and told her that "assuming that there was a $75,000 settlement, a third which were wages, a third of which were penalties and a third attorney's fees, that [ADP] would pay up to $50,000." D.E. 89-19 at 8 (Dawn Pilley deposition); D.E. 89-20 at 2. According to Ms. Pilley, the "offer [was] a $50,000 good-faith payroll invoice credit." D.E. 89-19 at 9. The *Walker* Action settled in December 2017 for $500,000. D.E. 86 ¶ 28; D.E. 95 ¶ 28. The fact that ADP offered Veritas $50,000 as a "good-faith payroll invoice credit" towards the *Walker* settlement, six months prior to settlement, is not proof of ADP's explicit prior written consent to settle the *Walker* Action. *See Cawthorn v. Auto-Owners Ins. Co.*, 6:16-cv-2240-Orl-28GJK, 2018

---

[7] The record does not indicate when the credits were applied or how the $120,000 was applied to any specific Texas Day-Rate Driver Action settlement. Although Ms. Pilley mentioned "a spreadsheet that had a list of credits on it" that counsel said "indicate[d] the year and the week number when a credit was issued [with] the credit amount," that spreadsheet is not part of the record and there is no evidence in the record as to when the $170,000 in credits were issued. D.E. 88-19 at 70–71.

U.S. Dist. LEXIS 71323, at *32 (M.D. Fla. Apr. 27, 2018) (payment toward settlement did not operate as a waiver of a "consent to settle" provision). In addition, Veritas's argument that because ADP "was on notice" of the Texas Day-Rate Driver Actions and provided some assistance ignores the unambiguous condition, which indisputably requires "prior written consent," not just notice.

Just because a term "can possibly be interpreted in more than one manner" does not mean the term is ambiguous. *Lawyers Title Insur. Corp.*, 52 F.3d at 1580. Although ADP provided Veritas with $170,000 in credits to help with the Texas Day-Rate Driver Actions and offered to contribute funds to settle the *Walker* Action, the undisputed facts make clear that ADP did not provide its prior written consent to the settlement of those actions. Count 3 is dismissed.[8]

### B.   Count 1: Breach of Contract

ADP argues that it is entitled to summary judgment on Veritas's breach of contract claim because: (1) the claim is time-barred; (2) Veritas cannot rely on the Agreement to effect a delegation of its duty to comply with the FLSA to ADP; and (3) Veritas cannot recover damages because the damages claimed were not proximately caused by an act or omission by ADP. D.E. 85 at 11–13. Veritas argues that it is entitled to summary judgment on the breach of contract count because: (1) ADP breached the Agreement by providing Veritas with inaccurate "guidance" as to the pay for the Texas Day-Rate Drivers and their entitlement to overtime compensation, in violation of Section 5(B) of the Agreement; and (2) ADP breached the Agreement by failing to inform Veritas about "potential and actual employee issues as they arise," *i.e.*, issues with overtime compensation, in violation of

---

[8] Having found that Count 3 should be dismissed because Veritas did not obtain ADP's express written consent to the settlements as required by the indemnification provisions in the Agreement, the Court need not consider ADP's third argument, *i.e.*, that the Agreement does not permit indemnification based on the facts of this case.

Section 3 of the Agreement. D.E. 88 at 6–19.[9]

The elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999). "A 'material breach' of a contract is a failure, without legal excuse, to perform any promise or obligation or that goes 'to the essence of the contract.'" *Oriole Gardens Condos., III v. Indep. Cas. & Sur. Co*., No. 11-60294-CIV, 2012 U.S. Dist. LEXIS 29100, 2012 WL 718803, at *11 (S.D. Fla. Mar. 6, 2012) (quoting *Covelli Family, L.P. v. ABG5, L.L.C*., 977 So. 2d 749, 752 (Fla. 4th DCA 2008)). Further, a party injured by a breach of contract is entitled to recover those damages that "naturally flow from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was entered." *Mnemonics, Inc. v. Max Davis Assocs., Inc.,* 808 So. 2d 1278, 1280 (Fla. 5th DCA 2002). The parties do not dispute the existence of a valid contract.

### i. Section 3 of the Agreement

Section 3 of the Agreement, governing the "Responsibilities of the Parties; Mutual Duty to Cooperate," provides: "TotalSource agrees to inform . . . [Veritas] about potential and actual employee issues as they arise to the extent TotalSource knows about the issues." D.E. 39 Ex. A § 3. Veritas argues that ADP breached Section 3 of the Agreement because it knew that Veritas's Texas Day-Rate Drivers were entitled to overtime and failed to inform Veritas that its method of compensating its Texas Day-Rate Drivers was contrary to the FLSA. *See* D.E. 88 at 17–19.

As an initial matter, the Court notes that the Agreement does not define "employee issues." Veritas seems to interpret "employee issues" broadly to include facts that Veritas contends would or should have put ADP on notice that Veritas was not complying with the FLSA, including that

---

[9] Veritas also appears to suggest that ADP breached the implied covenant of good faith and fair dealing. *Id.* at 18–19. This Court dismissed Veritas's claim for breach of implied duty of good faith because it was duplicative of the breach of contract count. D.E. 48 at 4–6.

ADP knew Veritas was compensating its some of its Texas drivers at a daily rate, was not tracking overtime hours, and was not paying them overtime. *See* D.E. 88 at 17. ADP does not take issue with this interpretation, *see* D.E. 93 at 12, but argues that Veritas cannot shift responsibility for FLSA compliance to ADP because under the Agreement, Veritas ultimately was responsible for compliance with the FLSA and for providing accurate information to ADP. The issue is this: did ADP fail to inform Veritas of known "potential and actual employee issues" regarding the Texas Day-Rate Drivers compensation? Because reasonable minds might differ on the inferences to be drawn from the facts, the Court will deny summary judgment on Count 1.

The following facts are undisputed. First, ADP advised Veritas that the Texas Day-Rate Drivers could be paid at a daily rate so long as they were paid overtime for hours worked in excess of 40 hours per week, and relayed this information to Veritas. D.E. 86 ¶¶ 11–12; D.E. 95 ¶¶ 11–12. Nonetheless, ADP never responded to Veritas's May 6, 2009 email asking whether there was an "overtime concern" for Texas Day-Rate Drivers so long as they were paid above minimum wage. D.E. 89 ¶ 18; D.E. 94 ¶ 18; D.E. 89-9.

Second, Veritas used ADP's payroll system to enter payroll information as to the Texas Day-Rate Drivers. D.E. 89 ¶ 24; D.E. 99 ¶ 24. Since the only drop-down options available on ADP's payroll system to reflect the method of compensation were "hourly" or "salary," Veritas entered the daily rate as the hourly rate in ADP's payroll system, so one hour was the equivalent to one day, two hours would be the equivalent of two days, etc. D.E. 89 ¶ 26; D.E. 99 ¶ 26. As a result, ADP's Employee Snapshots showed some of the Texas Day-Rate Drivers as earning salaries in the hundreds of thousands of dollars, and at least one Texas Day-Rate Driver as earning over $1 million. D.E. 89-11 at 22–26; D.E. 89-10 at 16–17. Veritas maintains that this should have put ADP on notice that something was "out of line" with respect to the Texas Day-Rate Drivers'

compensation, creating a known potential employee issue that ADP ignored. D.E. 89-10 at 17; D.E. 92 at 7.

Third, ADP's Client Bio for Veritas indicated, in at least four different places (including one note dating back to April 2012), that Veritas does "not allow OT [overtime] so no FLSA OT and they have some EE's that are on a daily rate." D.E. 89 ¶¶ 42–43; D.E. 99 ¶¶ 42–43; D.E. 89-15 at 4–6.

Fourth, ADP knew that Veritas had drivers in other states who were paid using hourly rates (including overtime), not a daily rate method. D.E. 89 ¶ 28; D.E. 99 ¶ 28. ADP never questioned why Veritas used different methods to pay its drivers in different states. D.E. 89 ¶ 29; D.E. 99 ¶ 29.

Fifth, Veritas did not become aware that its method of compensation for the Texas Day-Rate Drivers was unacceptable until December 2013–April 2014, when the Texas Day-Rate Driver Actions began to be filed. D.E. 89 ¶ 47; D.E. 99 ¶ 47.

These undisputed facts taken together or individually might or might not lead a jury to conclude that ADP knew or should have known of "potential and actual employee [overtime] issues" with the Texas Day-Rate Drivers' compensation and that ADP was required by the Agreement to so inform Veritas. Therefore, the jury will have to decide if ADP breached Section 3 of the Agreement. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

In making this decision, the Court has carefully considered ADP's argument that it should not be liable for its failure to raise the FLSA overtime issues with Veritas because under the

23

Agreement, Veritas "remain[ed] responsible for compliance with the FLSA." D.E. 39 Ex. A § (6)(B). However, Veritas paid ADP upwards of $1.4 million over approximately six years for basic human resource services which included "guidance" regarding FLSA compliance. Thus, while Veritas was ultimately responsible for compliance with the FLSA pursuant to Section 6(B), ADP also was obligated to "guide" Veritas in its efforts to comply with the statute pursuant to Section 3 of the Agreement. In other words, the Court is unpersuaded at this time to find that Section 6(B) overrides or negates ADP's obligations pursuant to Section 3.

ADP also argues that it did not actually know that any Texas Day-Rate Driver worked in excess of 40 hours per week because Veritas did not provide ADP with any report indicating how many hours its Texas Day-Rate Drivers worked. *See* D.E. 89 ¶ 16; D.E. 94 ¶ 16; D.E. 88 at 17. *See* D.E. 93 at 15–16. And, as ADP points out, under Section 6(B) of the Agreement, Veritas was responsible for providing ADP "with complete and correct information regarding hours worked, job classification, exempt and non-exempt status, and other data needed to compute accurately wages, taxes, etc." D.E. 39 Ex. A § (6)(B)(i). However, a reasonable jury could find that ADP should have questioned the absence of entries reflecting hours worked by the Texas Day-Rate Drivers. Accordingly, the jury will have to decide what ADP knew or should have known regarding the compensation paid to the Texas Day-Rate Drivers and whether ADP should have informed Veritas that there were issues regarding their entitlement to overtime.

### ii.   Section 5(B) of the Agreement

Under Section 5(B) of the Agreement: "TotalSource will provide Client **guidance** regarding commercially accepted human resource practice and **compliance with the various federal, state, or local employment laws**, such as anti-discrimination laws . . . [and] the Fair Labor Standards Act (FLSA)."  D.E. 39 Ex. A § (5)(B) (emphasis added).

The record includes testimony and documents that demonstrate a genuine issue of material fact regarding whether ADP breached Section 5(B) by failing to provide guidance regarding the applicability of the FLSA overtime requirements to the Texas Day-Rate Drivers or provided incorrect guidance in this regard.  To be sure, Ms. Radel testified that ADP never "told [her she] did not have to pay overtime. [ADP] didn't tell [her she] had to. ADP didn't tell [her she] didn't have to." D.E. 96-1 at 19–20.  Also, it is undisputed that ADP twice told Veritas, in writing, that drivers could be paid at a daily rate so long as they were paid overtime for hours worked in excess of 40 hours per week. D.E. 86 ¶¶ 11–12; D.E. 95 ¶¶ 11–12.  But Veritas claims that Ms. Radel subsequently spoke with Ms. Berman by phone and that Ms. Berman told Ms. Radel that Veritas could pay the Texas Day-Rate Drivers at a daily rate so long as their pay did not drop below minimum wage. Then, Ms. Berman never responded to Ms. Radel's May 6, 2009 email asking about overtime compensation.  Consequently, there is a genuine dispute of material fact as to what guidance, if any, ADP gave Veritas about its FLSA obligation as to the Texas Day-Rate Drivers and whether ADP breached Section 5(B) of the Agreement by providing incorrect guidance.[10]

### iii.  The Breach of Contract Claim is not Time-Barred

ADP contends that the breach of contract claims fails because it is barred by Florida's five-year statute of limitations for breach of contract actions. Fla. Stat. § 95.11(2)(b). The limitations period begins to run when the last element constituting the cause of action occurs. *Beck v. Lazard*

---

[10] The Court notes that the Agreement appears to impose a continuing obligation to provide guidance on the FLSA. *In re Firearms Import & Export Corp.*, 131 B.R. 1009, 1991 Bankr. LEXIS 1351, 25 Collier Bankr. Cas. 2d (MB) 1037 (S.D. Fla. 1991) (noting that executory contracts, *i.e.*, contracts in which both sides still have performance remaining, impose continuing obligations on the parties); *Arlaine & Gina Rockey, Inc. v. Cordis Corp.*, No. 02-22555-CIV, 2004 U.S. Dist. LEXIS 30763, 2004 WL 5504978, at *49, n. 15 (S.D. Fla. Jan. 5, 2004) (noting contracts with continuing obligations are those that call for a single, continuous performance, and not to contracts that call for performance (*i.e.*, royalty payments) in separate and distinct installments).

*Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999); Fla. Stat. § 95.031(1). This action was filed on February 22, 2019. D.E. 1. ADP argues that since Veritas alleges that the material breach—the inaccurate guidance during the purported phone call—occurred in April or May 2009, the statute of limitations expired in April or May 2014. D.E. 85 at 11–12.

ADP's argument fails. First, ADP does not address *when* Veritas learned that the FLSA guidance was inaccurate. *See, e.g.*, *Swain v. Curry*, 595 So. 2d 168, 170 (Fla. 4th DCA 1992) (statute of limitations begins to run when claimant learns of the breach). The first Texas Day-Rate Driver Action, the *Mason* Action, was filed in October 2013 and settled in July 2014. The parties agree that April 2, 2014 is the last date on which Veritas would have been made aware that its failure to pay statutory overtime while using the daily rate was legally improper. D.E. 89 ¶ 47; D.E. 99 ¶ 47. Second, the damages Veritas seeks to recover accrued from at least July 2014, when the *Mason* Action settled, through August 2017, when the *Walker* Action settled. Accordingly, the statute of limitations does not appear to bar the breach of contract claim.

C.   Damages

Veritas seeks $1,503,332.61 in damages from ADP. D.E. 87-1 at 177. This amount excludes the $50,000 ADP contributed to the *Walker* Action. *Id.* ADP has contributed a total of $170,000 to offset Veritas's costs and attorneys' fees incurred defending the Texas Day-Rate Driver Actions. D.E. 97-3 at 19–20.

ADP asks the Court to strike certain elements of the damages sought by Veritas because such damages were Veritas's responsibility under the Agreement, are expressly excluded as recoverable damages under the Agreement, and/or because the damages are the result of Veritas's

own inactions.[11] D.E. 85 at 13–18. Specifically,  ADP asks the Court to strike Veritas's claimed damages for: (A)  back pay, meaning overtime compensation, it paid  to the Texas Day-Rate Drivers in the Texas Day-Rate Driver Actions; (B) payroll taxes and processing fees relating to the settlement checks issued in the Texas Day-Rate Driver Actions; (C) Texas administrative service fees from 2009 through 2015; (D) lost profits or revenue; and (E)  post-February 5, 2014 damages based on Veritas's failure to  begin paying overtime  once it was on notice that it was in violation of the FLSA.[12] D.E. 85 at 13–18. Veritas responds that it is entitled to all of the aforementioned damages because they are causally related to the breach. D.E. 92 at 17–20.

"It is well-settled that the injured party in a breach of contract action is entitled to recover monetary damages that will put it in the same position it would have been had the other party not breached the contract." *Capitol Environ. Srvcs., Inc. v. Earth Tech, Inc*., 25 So.3d 593, 596 (Fla. 1st DCA 2009) (citing *Fla. E. Coast Ry. Co. v. Beaver Street Fisheries, Inc*., 537 So. 2d 1065, 1068 (Fla. 1st DCA 1989). "The injured party is entitled to recover all damages that are causally related to the breach so long as the damages were reasonably foreseeable at the time the parties entered into the contract." *Id.* (citations omitted). Damages are foreseeable when they are the "proximate and usual consequence" of the breaching party's act. *Id.* "It is not necessary that the parties have contemplated the exact injury which occurred as long as the actual consequences 'could have been reasonably expected to flow from the breach.'" *Id.*

---

[11] The Court treats ADP's request to strike certain damages as a motion for summary judgment on those damages. *See, e.g.*, *Pinkerton & Laws Co. v. Roadway Express, Inc*., 650 F. Supp. 1138, 1141 (N.D. Ga. 1986).

[12] ADP does NOT move to strike the following damages Veritas seeks: (1) liquidated damages Veritas paid out to the Texas Day-Rate Drivers in the Texas Day-Rate Driver Actions; (2) attorneys' fees and the class representative fee Veritas paid as part of the settlement of the Texas Day-Rate Driver Actions; and (3) Veritas's attorneys' fees and costs incurred in defending the Texas Day-Rate Driver Actions.

(citing *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1281 (Fla. 5th DCA 2002)).

Importantly, the parties here agree that the failure to pay statutory overtime to the Texas Day-Rate Drivers violated the FLSA. D.E. 89 ¶ 47; D.E. 94 ¶ 47; D.E. 89-18; D.E. 86 ¶ 31; D.E. 95 ¶ 31.

### i. Back Pay

Veritas seeks to recover all back pay it paid out to the Texas Day-Rate Drivers to settle the Texas Day-Rate Driver Actions, totaling $179,983.80. D.E. 39 ¶¶ 11–12; D.E. 86 ¶ 33.[13] ADP argues that it should not have to pay these damages because Veritas should have, and would have, paid this amount as required overtime compensation, regardless of the Texas Day-Rate Driver Actions. Veritas contends it is entitled to back pay because due to ADP's breach, Veritas was not able to bill E&L for the overtime compensation at issue, as it otherwise would have had the overtime been paid in the ordinary course of their relationship. D.E. 87-1 at 237–38.

Had Veritas paid overtime to the Texas Day-Rate Drivers as required by the FLSA, E&L would have been required to reimburse Veritas pursuant to the agreement between Veritas and E&L. According to Ms. Radel's deposition:

> Ms. Radel: [W]e would have billed [E&L] for the hours that were worked in addition to losing profits. So they are two separate areas.
> Q: Why should TotalSource have to pay for any compensation to those employees?
> A: Because we had to pay for it outside of being able to bill our client for it.
> Q: But, presumably, that's compensation that they would have been owed, if they had been paid properly, correct?

---

[13] Veritas paid the following in back pay wages as to each Texas Day-Rate Driver Action:
1. $1,573.00 in *Mason*.
2. $786.50 in *Ozen*.
3. $1,000.00 in *Emerson*.
4. 13,874.94 in *Bellard et al.*
5. $162,749.36 in *Walker*.

D.E. 39 ¶¶ 11–12; D.E. 87-1 at 177.

A: And **we would have billed for it, had they been paid properly, so we would have been reimbursed by our client for it. Plus a profit margin.**
Q: Veritas never went after E&L to recover the back pay?
A: No. I'm not sure why we would.

*Id.* (emphasis added).

Because Veritas and/or E&L, as joint employers ultimately would have been responsible for paying the overtime wages at issue in the Texas Day-Rate Driver Actions, Veritas cannot shift that liability onto ADP. Veritas, as a co-employer of the Texas Day-Rate Drivers, was responsible for, among other things, compensating the Texas Day-Rate Drivers pursuant to the FLSA. D.E. 89 ¶ 2; D.E. 94 ¶ 2; D.E. 89-12. Veritas's obligation to pay these wages was, thus, the direct result of its employment relationship with the Texas Day-Rate Drivers and was not caused by ADP's alleged mis-advice.[14] *See Haynes v. Ocean Hospitalities*, No. 5:11-CV-250-Oc-32PRL, 2013 U.S. Dist. LEXIS 205693 at *19 (M.D. Fla. Jan. 14, 2013) ("[I]t would, in fact, be repugnant to the FLSA to allow a[n] employer to essentially avoid FLSA liability . . . by putting the ultimate risk on a non-employer third party."). In other words, Veritas and/or E&L would have been responsible for the payment of back pay wages regardless of the Texas Day-Rate Driver Actions, and, as such, the payment of back pay is not causally related to ADP's alleged breach. Accordingly, Veritas cannot recover back pay damages.

### ii. Payroll Taxes and Processing Fees for Settlement Checks

Veritas seeks to recover all payroll taxes and processing fees associated with the settlement checks, in the amount of $19,745.37. D.E. 87-1 at 177 (listed as "ADP Tax and Fees" in Veritas's damages chart); D.E. 39 ¶¶ 11–12. The Court starts by observing that Veritas's claimed damages

---

[14] Veritas did not require E&L to reimburse it for the back pay damages paid out in the Texas Day-Rate Driver Actions. 86 ¶ 33(f); D.E. 95 ¶ 33(f).

in these categories are not sufficiently itemized or explained for the Court to rule entirely at this juncture.

ADP asks the Court to strike these damages because under Section 7(B) of the Agreement, Veritas "acknowledge[d] that it is responsible for all taxes, if any, arising out of the execution and performance of this Agreement." D.E. 85 at 14 (citing D.E. 39 Ex. A § (7)(B)). While the Court agrees that Veritas cannot as a legal matter shift to ADP responsibility for the payment of payroll taxes that should have been paid contemporaneously with the payment of wages and overtime, the Court cannot exclude on this record the possibility that Veritas was required to pay additional taxe, penalties or fees due to its alleged reliance on ADP's advice or non-advice regarding the Texas Day-Rate Drivers' entitlement to overtime compensation.

ADP also asks the Court to strike Veritas's claim for reimbursement of processing fees (not payroll taxes) in the *Walker* Action because it did not charge Veritas processing fees in the *Walker* Action. D.E. 85 at 14. The Court agrees as it is undisputed that ADP did not charge Veritas for any administrative processing fees in connection with the processing of the settlement checks in the *Walker* Action, D.E. 86 ¶ 33(d); D.E. 95 ¶ 33; D.E. 87-2 at 27 (Ms. Radel's deposition).

In sum, the Court finds as a matter of law that Veritas cannot recover an amount attributable to payroll taxes that should have been paid contemporaneously with the overtime that should have been paid to the Texas Day Rate Drivers, but otherwise denies summary judgment as to the payroll taxes and processing fees. In addition, the Court finds as a matter of law that Veritas cannot recover processing fees it was never charged in connection with the *Walker* Action settlement.

### iii.  All Texas Administrative Service Fees from 2009 through 2015

Veritas seeks to recover all administrative service fees paid to ADP on the gross payroll for "all Texas worksite employees" paid between May 2009 and June 2015—regardless of whether

they were part of the Texas Day-Rate Driver Actions and irrespective of other services provided to Veritas for which the bundled service fee applied—in the amount of $826,716.00. D.E. 87-1 at 177; 86 ¶ 33(e); D.E. 95 ¶ 33. ADP argues that these damages are consequential and Veritas is not entitled to any consequential damages because under the Agreement, "[n]either party will be liable to the other party for special, incidental, consequential, or punitive damages." D.E. 39 Ex. A § (9)(A). However, ADP ignores the fact that this provision is part of the "Indemnification – General Provisions" clause, and does not apply to the Agreement as a whole.

The record is unclear as to the exact nature of the administrative fees that Veritas seeks to recover, but it is clear that Veritas cannot recover administrative fees other than those paid in connection with the Texas Day-Rate Drivers Actions. "In restoring the injured party to the 'same position,' he 'is not entitled to be placed, because of that breach, in a position better than that which he would have occupied had the contract been performed.'" *Lindon v. Dalton Hotel Corp.*, 49 So. 3d 299, 305–06 (Fla. 5th DCA 2010) (quoting *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 608 (S.D.N.Y. 1977) (applying Florida law); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. a (1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will . . . put him in as good a position as he would have been in had the contract been performed."). "Instead, the injured party may only recover those damages that naturally flow from the breach and can reasonably be said to have been contemplated by the parties at the time that the contract was made." *Lindon*, 49 So. 3d at 306 (citing *Mnemonics*, 808 So. 2d at 1280; *Scott v. Rolling Hills Place, Inc.*, 688 So. 2d 937, 940 (Fla. 5th DCA 1996)). By allowing Veritas to recover $826,716 for six years' worth of services ADP rendered, Veritas would be getting more than the benefit of its bargain. As explained by the parties, these fees relate to *all* services rendered in relation to the all of Veritas's "Texas worksite employees," both

31

proper human resources services and services related to the alleged breach. Accordingly, summary judgment is granted in part: Veritas cannot recover administrative fees unrelated to the non-payment of overtime to Texas Day-Rate Drivers and the subsequent litigation.  However, the Court takes no position at this time, due to the undeveloped record, regarding the extent to which this sub-set of administrative fees might be recoverable.

### iv.  Lost Profits or Revenue

Veritas seeks to recover damages for alleged lost profits or revenue based on what Veritas would have invoiced E&L had  the Texas Day-Rate Drivers been paid overtime concurrently with other wages in the amount of $266,040.53. D.E. 87-1 at 177. Veritas would have billed  E&L for reimbursement of all compensation paid the Texas Day-Rate Drivers with a 32% markup. 86 ¶¶ 33–34; D.E. 95 ¶¶ 33–34. Again, ADP argues that the Court must strike these damages because they are consequential damages, which the Agreement forbids.

"[G]eneral (i.e., direct) damages [are] those damages that compensate for the value of the very performance promised and consequential damages are those damages that seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Silverpop Sys., Inc. v. Leading Market Tech., Inc*., 641 F. App'x 849, 855–56 (11th Cir. 2016) (citation and quotation marks omitted). Consequential damages are:

> Any damages that do not flow directly from the breach of the specific terms of the
> contracts upon which [p]laintiff sued, and which this Court found [d]efendants to
> have breached, are consequential in nature. More specifically, they are indirect
> damages that relate to losses incurred by the non-breaching party in its dealings,
> often with third parties, which were a proximate result of the breach. Both Florida

courts and the Eleventh Circuit have found that these types of indirect **lost profits are the quintessential example of consequential damages**.

*Validsa, Inc. v. PDVSA Servs*., No. 08-21682-CIV-KING-BANDSTRA, 2009 U.S. Dist. LEXIS 139147 *5 (S.D. Fla. Jan. 28, 2010) (emphasis added) (citing *Nyquist v. Randall*, 819 F. 2d 1014, 1017–18 (11th Cir. 1987); *Hardwick Props. v. Newbern*, 711 So. 2d 35, 40 (Fla. 1st DCA 1998)). To recover lost profits based on a breach of contract, the plaintiff must establish that the profits were reasonably in the contemplation of the defaulting party at the time of the contract's formation. *See Frenz Enters., Inc. v. Port Everglades*, 746 So. 2d 498, 504 (Fla. 4th DCA 1999); *Crain Auto. Group v. J&M Graphics*, 427 So. 2d 300, 301 (Fla. 3d DCA 1983).

Summary judgment is denied as to Veritas's claim for lost profits or revenue. Such damages were reasonably contemplated by ADP at the time of the Agreement's formation. ADP knew that Veritas is a staffing agency with its own clients, and it was reasonably foreseeable that any breach by ADP would impact Veritas's profits and its relationship with its own clients.

The Court notes that the amount of lost profit or revenue damages that Veritas seeks is unclear. It is undisputed that Veritas's calculation of the lost profits or revenue includes recovery of the back pay it was required to pay in settlement of the Texas Day-Rate Drivers Actions, which it has sought as a separate component of damages. 86 ¶¶ 33–34; D.E. 95 ¶¶ 33–34. Veritas concedes it cannot recover these damages twice. *Id.*. Veritas does not explain how it arrived at the amount of $266,040.53. D.E. 87-1 at 177. While Veritas contends it seeks to recover what it would have invoiced E&L had the overtime due to the Texas Day-Rate Drivers been paid when the work was performed, which Veritas would have billed to E&L for reimbursement with a 32% markup, 32% of the back pay wages ($179,983.80) is $57,594.816—not $266,040.53.

In any event, the Court will  deny summary judgment as to Veritas's lost profits or revenue damages. However, at trial Veritas will have to prove the amount of lost profits or revenue

that it claims to have incurred with a reasonable degree of  certainty.  Lost profits are only recoverable if their loss is proved with a reasonable degree of certainty. *See Douglass Fertilizers & Chemical, Inc. v. McClung Landscaping, Inc.*, 459 So. 2d 335, 336 (Fla. 5th DCA 1984); *Lucas Truck Service Co. v. Hargrove*, 443 So. 2d 260, 262 (Fla. 1st DCA 1983).

> ### v. Damages Incurred After February 5, 2014 or April 2, 2014 for Veritas's Failure to Timely Begin Paying Overtime to Texas Day-Rate Drivers

Finally, ADP argues that all of Veritas's claimed damages should be limited to damages incurred in connection with the Texas Day-Rate Drivers who may have been improperly paid before February 5, 2014, which "is a conservative estimate of when [Veritas] was first on notice of an overtime violation and should have begun to pay statutory overtime," or in the alternative, April 2, 2014, which is when Veritas learned from counsel that it committed FLSA violations. D.E. 85 at 16–17.

The Court rejects ADP's argument that Veritas cannot recover damages incurred after February or April 2014. Arguably but for ADP's alleged breach, Veritas would not have used a daily rate method and violated the FLSA. And the decisions made as to when to convert the Texas Day-Rate Drivers to hourly rates of pay was made in response to the initiation of lawsuits that were arguably the direct result of ADP's breach. However, damages incurred on or after January 1, 2015 in the *Walker* Action should not be ADP's responsibility because E&L agreed to pay such damages. D.E. 87-2 at 5 ("[Ms. Radel]: the arrangement that was made in regards to the Walker class action apportioned anything that happened after January 1, 2015 was E&L's responsibility; prior to January 1, 2015, was Veritas', and that is documented in the Fisher and Phillips settlement

arrangement."). Thus, summary judgment is granted in part: Veritas cannot recover damages incurred after January 1, 2015 in the *Walker* Action.

**IV.**     **Conclusion**

Summary judgment is denied as to Count 1 and granted as to Count 3. Further, Veritas cannot recover the following damages: (1) back pay in the amount of $179,983.80; (2) payroll taxes that should have been paid contemporaneously with back pay; (3) processing fees Veritas was never charged in the *Walker* Action; (4) administrative fees for anyone other than the Texas Day-Rate Drivers; and (5) damages incurred after January 1, 2015 in the *Walker* Action.  For the foregoing reasons, it is hereby

ORDERED AND ADJUDGED that the Motion, D.E. 85, is GRANTED IN PART. Count 3 is DISMISSED. It is further

ORDERED AND ADJUDGED that the Motion, D.E. 88, is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this _30th__ day of October, 2020.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

Copies furnished:
All counsel of record